LOUIS R. FORSELL ET AL. *v.* CONSERVATION COMMISSION OF THE TOWN OF REDDING
(14704)

Lavery, Landau and Spallone, Js.

Argued June 3—officially released September 24, 1996

*Edwin C. Pearson,* for the appellant-appellee (defendant).

*Kevin J. Gumpper,* for the appellees-appellants (plaintiffs).

SPALLONE, J. The defendant, the conservation commission of the town of Redding (commission), appeals from the trial court's decision directing it either to approve the plaintiffs' inland wetlands applications or to hold additional hearings on the applications. The commission claims that the trial court improperly determined that its denial of the plaintiffs' applications was not supported by substantial evidence. The plaintiffs filed a cross appeal claiming that the trial court improperly remanded the case to the commission with the option of holding further hearings. We agree with the plaintiffs.

The following facts are pertinent to these appeals. The plaintiffs are the trustees of a trust that owns two parcels of land on Sunnyview Drive in Redding. The parcels of land, which are roughly across the street from one another, are located at 15 and 16 Sunnyview Drive and are referred to as lots 7 and 45, respectively. In 1993, the plaintiffs entered into a contract to sell the

parcels to a developer. In October, 1993, the developer applied to the commission for inland wetlands licenses to build a house and septic system on each parcel. These applications were governed by the inland wetlands and watercourses regulations of the town of Redding (wetlands regulations) pursuant to which one must acquire a license before engaging in any regulated activities.[1]

On November 2, 1993, the commission held a meeting at which the plaintiffs presented a letter from a certified soil scientist, Marc Beroz, stating that there were no wetlands on lots 7 and 45. The plaintiffs also presented topographical maps of the parcels, prepared by an engineer, Steven Trinkaus, demonstrating the locations of the proposed houses and septic systems and their distances from the nearest wetlands and watercourses. The maps indicated that the houses and septic systems were more than the minimum distance from wetlands or watercourses required by § 2.21 (a) and (b) of the wetlands regulations. The commission also received a

---

[1] Section 2.21 of the wetlands regulations provides: " 'Regulated Activity' means any operation within, or use of, a Regulated Area involving removal or deposition of material, or any obstruction, construction, alteration or pollution of such Regulated Area. In all cases, the precise location of wetlands and watercourses shall be determined by the actual character of the land, the distribution of wetlands soil types and locations of watercourses. The Applicant shall provide this information to the Commission. Such determination shall be made by field inspections and testing conducted by a soil scientist, where soil classifications are required, or by any other qualified individual where locations of watercourses are required.

"The following are also deemed regulated activities:

"a. The location of any portion of any subsurface waste disposal system, including any earth-disturbing activities reasonably associated therewith . . . within 150 feet of the mean water line and/or perimeter of all other watercourses and within 50 feet of all wetlands.

"b. The location of any portion of any structure, including any earth-disturbing activities reasonably associated therewith . . . within 50 feet of all other wetlands and watercourses. . . .

"d. Any activity, the likely effect of which will have a significant impact on the existing state of any of the wetlands and watercourses of the Town of Redding."

report from its expert, James MacBroom, describing shallow groundwater levels in the neighborhood, but also stating that there were no obvious wetlands areas on the parcels. Finally, the commission received a report from its environmental consultant, Barbara Obeda, stating that she found silky dogwoods, a plant common to wetlands areas, along one side of lot 45 and throughout lot 7.

The commission conducted an on-site inspection on November 7, 1993, and held public hearings on the plaintiffs' applications on January 18, February 15, and March 1, 1994. The commission discussed the applications during its meetings on March 15 and April 5, 1994. At the April 5 meeting, the commission voted unanimously to deny the plaintiffs' applications for failure to comply with §§ 7.2 (a), 7.3 (a) and 7.7 of the wetlands regulations.[2] The plaintiffs appealed to the trial court

[2] Section 7 of the wetlands regulations provides in pertinent part: "7.1 . . . [T]he Commission shall consider and evaluate the environmental impact of the activity, particularly its propensity to directly or indirectly cause or result in the alteration or pollution of wetlands or watercourses . . . .

"The following General Criteria and Detailed Parameters will guide the Commission in making its final decision. It shall be the burden of the Applicant to establish that the proposed regulated activities are consistent with these General Criteria and Detailed Parameters, wherever applicable.

"7.2 General Criteria

"a. The alternatives to the proposed action, including a consideration of alternatives which might enhance environmental quality, or have a less detrimental effect, and which could feasibly attain the basic objectives of the proposed activity. . . .

"7.3 Detailed Parameters

"a. The ability of the area, in which the regulated activity occurs, to continue to absorb, store or purify water or to prevent flooding, and the projected effect on the water table and drainage patterns. . . .

"7.7 In the case of any application which received a Public Hearing, a license shall not be issued unless the Commission finds that a feasible and prudent alternative does not exist. In making this finding, the Commission shall consider the criteria and parameters set forth in this Section. This finding and the reasons therefore shall be stated in the record of the decision by the Commission."

pursuant to General Statutes § 22a-43.[3] The trial court concluded that the commission did not present substantial evidence that the applications proposed a regulated activity under § 2.21 of the wetlands regulations.

## I

The commission claims that the trial court improperly determined that the commission's decision that the applications proposed a regulated activity was not supported by substantial evidence.[4] Specifically, the commission claims that the trial court misinterpreted the terms wetlands and watercourses as found in its wetlands regulations. The commission asserts that a watercourse, as that term is defined in its wetlands regulations, exists on each of the parcels of land and therefore both applications proposed regulated activities pursuant to § 2.21 (a) and (b). The commission also claims that, because the proposed construction would likely have a significant impact on the wetlands and watercourses in the area, the applications propose regulated activities pursuant to § 2.21 (d).

On an appeal from a decision of an inland wetlands commission to the Superior Court, "the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision." *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587, 628 A.2d 1286 (1993). "The trial court must search

---

[3] General Statutes § 22a-43 provides in pertinent part: "[A]ny person aggrieved by any . . . decision . . . made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner . . . may . . . appeal to the superior court for the judicial district where the land affected is located . . . ."

[4] The determination of whether an application proposes a regulated activity is a threshold question. If an application proposes a regulated activity, the commission must then decide whether to grant a license, grant a license with conditions, limitations or modifications, or deny the application. Redding wetlands regulations § 6.1. This decision must be consistent with § 7 of the wetlands regulations. See footnote 2. If, however, it is determined that an application did not propose a regulated activity, then the commission no longer has authority to require an applicant to acquire a license.

the record of the agency hearings to determine whether there was an adequate basis for the inland wetlands commission's decision." *Milardo* v. *Inland Wetlands Commission*, 27 Conn. App. 214, 217–18, 605 A.2d 869 (1992). "The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . [E]vidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact at issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . . [A]n administrative agency is not required to believe any witness, even an expert, nor is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." (Citations omitted; internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 539–42, 525 A.2d 940 (1987).

The commission first asserts that the applications propose a regulated activity pursuant to § 2.21 (a) and (b) of the wetlands regulations. Subsection (a) specifies that any portion of any subsurface waste disposal system, such as a septic system, within 150 feet of a watercourse or within fifty feet of a wetlands[5] is a regulated activity. The plaintiffs presented the evidence of a soil scientist, Beroz, that there were no wetlands soils on

[5] Pursuant to § 2.29 of the wetlands regulations, the characteristics of any of the types of soil in an area determine whether the land in question is a wetland. See also General Statutes § 22a-38 (15).

the two parcels of land. A map prepared by the plaintiffs' expert, Trinkaus, showed that the proposed septic system on lot 7 is more than 160 feet from the nearest wetlands or watercourse, and the proposed septic system on lot 45 is 180 feet from the nearest watercourse and substantially further than fifty feet from the nearest wetlands. The commission presented no evidence regarding the presence or location of any wetlands.

The commission asserts, however, that each of the two parcels of land contains watercourses and, therefore, the applications do propose regulated activities. Pursuant to § 2.28 of the wetlands regulations, watercourses include marshes, swamps and bogs.[6] The determination of whether a parcel of land is a marsh, swamp, or bog relies in part on the type of vegetation naturally occurring there.[7] The commission contends that because a wetlands species of plant grows on each parcel of land, each parcel contains a watercourse. The commission relies on the evidence presented by its environmental consultant, Obeda, that the parcels con-

---

[6] Section 2.28 of the wetlands regulations provides: " 'Watercourses' means rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs, and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon the Town of Redding, regardless of their soil types."

[7] Section 2 4 of the wetlands regulations provides: " 'Bog' means a poorly drained area containing an accumulation of organic material and characterized by an association of plants recognized as bog species. Typical examples of bog species are listed in Niering, W. and Goodwin, R., 'Inland WetlandsPlants of Connecticut' (1973)."

Section 2.16 of the wetlands regulations provides: " 'Marsh' means an area that has a water table at or above the surface throughout most of the year, subject to seasonal fluctuations, and that contains an association of plants recognized as marsh vegetation. Typical examples of marsh vegetation are listed in Niering, W. and Goodwin, R., 'Inland WetlandsPlants of Connecticut' (1973)."

Section 2.26 of the wetlands regulations provides: " 'Swamp' means an area dominated by an association of plants recognized as swamp species. Typical examples of swamp species are listed in Niering, W. and Goodwin, R., 'Inland WetlandsPlants of Connecticut' (1973)."

tain a wetlands species of plant. Obeda submitted a report to the commission regarding her inspection of the two parcels of land. Obeda reported that lot 45 contained "small silky dogwood plants along the west side of this lot, in an area marked on an earlier sketched map as a 'ditch to carry off groundwater.' " The report also states that "there is a drainage ditch along the west side of this lot . . . . The septic system [however] appears to be within the regulated distance from this drainage ditch." In discussing lot 7, the Obeda report stated that "[a] considerable number of small silky dogwood bushes remained throughout this lot." The report indicated that silky dogwood plants are a wetlands species of plant.[8]

We disagree with the commission that its decision that the applications proposed a regulated activity pursuant to § 2.21 (a) and (b) was supported by substantial evidence. Neither the Obeda report nor any other evidence specifically states that the parcels of land contain a marsh, bog, swamp or any other watercourse. In addition, under the wetlands regulations, the presence of a wetlands species on a parcel of land is not enough, on its own, to indicate that the parcel contains a watercourse.[9] First, the proper identification of a bog requires a determination that the land contains an accumulation of organic material *and* an association of plants recognized as bog species. Redding wetlands regulations § 2.4. There is no evidence in the record that either parcel contained an accumulation of organic material *or* an association of bog species of plant; Obeda identified the silky dogwood as a wetlands species of plant. Second, the proper identification of a marsh requires a finding that the area has a water table at or above

---

[8] Obeda cited W. M. Lefor, A Guide to Common WetlandsPlants of Connecticut and Their Identification (1989), published by the water resources unit of the Connecticut department of environmental protection.

[9] See footnotes 6 and 7.

the surface most of the year *and* an association of marsh vegetation. Redding wetlands regulations § 2.16. A report by MacBroom indicated only that the parcels had a "high" water table, and there was no finding that there was marsh vegetation on the parcels. Third, the proper identification of a swamp requires a conclusion that the land is "*dominated* by an association of plants recognized as swamp species." (Emphasis added.) Redding wetlands regulations § 2.26. The Obeda report stated that silky dogwoods were found along one side of lot 45 and "throughout" lot 7. The report did not indicate that they dominated the lot and the silky dogwood was not identified as a swamp species. Thus, there was no evidence that either lot contained a watercourse as that term is defined by the wetlands regulations. Because the commission relied solely on the alleged presence of watercourses on the parcels to support its assertion that the applications proposed regulated activities under § 2.21 (a) and (b), we conclude that the trial court properly determined that the commission's decision, pursuant to those subsections, was not supported by substantial evidence.

The commission next asserts that the applications propose a regulated activity pursuant to § 2.21 (d) of the wetlands regulations. Section 2.21 (d) provides that "any activity, the likely effect of which will have a significant impact on the existing state of any of the wetlands and watercourses of the Town of Redding" is a regulated activity. As a preliminary matter, we agree with the commission that it may "exercise jurisdiction outside [of its] jurisdictional boundaries if activities on 'unregulated' land would affect wetlands." *Ahearn* v. *Inland Wetlands Agency-Conservation Commission*, 34 Conn. App. 385, 391, 641 A.2d 812, cert. denied, 230 Conn. 911, 645 A.2d 1015 (1994), citing *Aaron* v. *Conservation Commission*, 183 Conn. 532, 542–43, 441 A.2d 30 (1981); see also *Manatuck Associates* v. *Conser-*

*vation Commission*, 28 Conn. App. 780, 791, 614 A.2d 449 (1992). We must still determine, however, whether there is substantial evidence that the applications propose activities that are likely to have a significant impact on nearby wetlands or watercourses in order to ascertain if the commission has the authority to require the plaintiffs to obtain inland wetlands licenses.

Although a careful review of the record discloses that the commission anticipated asserting that the applications proposed regulated activities pursuant to § 2.21 (d) of the wetlands regulations, the commission never specifically determined that the proposed activities were likely to have a significant impact on the nearby wetlands or watercourses.[10] Nevertheless, the commission's denial of the applications is an implicit decision that the applications proposed regulated activities, and a reviewing court " 'must search the record of the hearings before th[e] commission to determine if there is an adequate basis for its decision.' " *Samperi* v. *Inland Wetlands Agency*, supra, 226 Conn. 588–89, quoting *Gagnon* v. *Inland Wetlands & Watercourses Commission*, 213 Conn. 604, 611, 569 A.2d 1094 (1990).

The record reveals the following information. First, it is undisputed that both wetlands and watercourses are in close proximity to the two parcels of land; the plaintiffs' expert prepared a map that demonstrated that the houses and septic systems are to be located between 140 and 180 feet from the nearest wetlands or watercourse. Second, as the trial court noted, current

---

[10] The following exchange occurred at the public hearing on March 1, 1994:

"[Unidentified]: I do not understand whether you have decided this is a regulated activity or not. There are no regulated activities on the . . .

"Chairman of the commission: We're trying to determine whether or not the impact of this activity or what the impact of this activity will be on the wetlands.

"[Unidentified]: That's a decision yet to be made?

"[Chairman]: Right. At least I haven't come to any great monumental conclusion as yet. We're trying to gather in all the information."

residents of Sunnyview Drive testified at length about water problems on the street, including water on their property, flooding in their basements, and their concerns about existing septic systems and wells. Residents also submitted photographs of flooding on Sunnyview Drive properties. Third, the plaintiffs' expert, Trinkaus, and the commission's experts, Obeda and MacBroom, submitted reports regarding the septic systems' nitrogen renovation rates. According to Trinkaus' and MacBroom's estimated rainfall infiltration rates, the quality of the effluent plume on the two parcels would be within the requirements of the department of environmental protection. In addition, MacBroom and Bridgeport Hydraulic Company submitted memos to the commission stating that the design of the sewage disposal systems on the two parcels complied with the state public health code.

We conclude that the commission's decision that the plaintiffs' applications proposed activities the impact of which on the existing state of Redding watercourses or wetlands was both likely and significant is not supported by substantial evidence. Although the commission now asserts that the flood conditions described by the Sunnyview residents constitute a watercourse under the wetlands regulations, the commission did not dispute, during either the public hearing or its own meetings, the plaintiffs' expert's determination of the location of the closest watercourse.

Even if we were to assume that the flooding described by the Sunnyview residents does constitute a watercourse, there is simply no evidence that the impact on Redding watercourses or wetlands will be significant. The commission urges that activities likely to have a significant impact include those activities enumerated as "significant activities" in § 2.24 of the wetlands regulations. Section 2.24, however, defines "significant

activity" as "any activity . . . which may have a major
effect or significant impact on the area for which an
application has been filed or on another part of the
inland wetlands, watercourse or aquifer system . . . ."
We reject the commission's circular reasoning and
adopt our reasoning in *Keiser* v. *Conservation Com-
mission*, 41 Conn. App. 39, 674 A.2d 439 (1996). There,
we stated that "[a]n activity that merely impacts or
affects wetlands is not a significant activity . . . ." Id.,
44. As the trial court noted, the commission was con-
cerned that the proposed construction would exacer-
bate the flooding on the street and the residents were
concerned about the impact of any new construction
on their septic systems. Even if this may be construed as
evidence that the proposed construction could impact
nearby wetlands or watercourses, there was no discus-
sion or evidence that such an impact, including a poten-
tial septic system failure, would be significant.

Finally, even if we were to assume that the applica-
tions proposed activities that could significantly impact
watercourses or wetlands, there was no evidence or
discussion that such impact was likely. On the contrary,
the record reveals that it was the commission's concern
about the drainage problem on the properties, not its
concern about watercourses or wetlands, that per-
suaded it to deny the applications.[11] Indeed, during the

---

[11] The following comments by the members of the commission at its
meetings are illustrative:

"V. DeMasi: [A]lthough it's not maybe wetlands per se there are character-
istics here that are problematical and lead to a lot of runoff and water flow
and stuff. . . . I'm very sympathetic towards the neighbors' problems . . . .

"J. Jaslow: [T]hey've gone to great lengths to make sure that everything
conforms and it's not that that I have a problem with. I just have a hard time
consenting to something that you know has a great potential to exacerbate an
already pretty lousy situation there.
* * *

"L. Berger: My headset is really I don't think that these two lots should
be built because of the problems in the area, and I'm looking for something
in the regulations that support that . . . .
* * *

commission's meetings, the potential impact on the wetlands and watercourses was mentioned only once and never resolved.

We agree with the trial court that the commission's decision that the plaintiffs' applications propose activities likely to have a significant impact on the Redding wetlands or watercourses was not supported by substantial evidence. The applications, therefore, do not propose regulated activities as defined by the wetlands regulations.

## II

The plaintiffs cross appeal, claiming that the trial court improperly remanded the case to the commission with the option of holding additional hearings. They assert that because there is only one conclusion that the commission could reach on their applications, the trial court should have directed the commission to approve them.

In *Milardo* v. *Inland Wetlands Commission*, supra, 27 Conn. App. 223, we stated that " '[w]hen agency action is overturned . . . because of invalid or insufficient findings . . . a court must ordinarily remand the matter under consideration to the agency for further consideration.' *Feinson* v. *Conservation Commission*, [180 Conn. 421, 429–30, 429 A.2d 910 (1980)]. 'When it

"J. Jaslow: I feel satisfied that the developer-builder plans for the new homes have gone to some lengths to make sure it's a good plan . . . . I just can't see approving [the applications] until something is done to alleviate that situation.

"D. Pattee: And you're talking about the drainage problems.

"J. Jaslow: The drainage problem, yeah. . . .

"L. Berger: Do we feel we can . . . deny this because of drainage problems to other properties? . . . Is that alright to do?

"J. Jaslow: In other words, do we have enough grounds? Well, you know, it was also brought up possible impact on wetlands given the situation—if it were exacerbated with additional homes, and I think that's a bona fide reason as well."

appears, however, that the [agency] could reasonably reach only one conclusion, the court may direct the [agency] to do that which the conclusion requires.' *Chevron Oil Co.* v. *Zoning Board of Appeals*, 170 Conn. 146, 153, 365 A.2d 387 (1976)." In *Milardo*, we affirmed the trial court's remand to the commission to determine whether the applicant's proposed method of crossing wetlands was the only feasible alternative. Id., 224; see also *A.D.A.M. Land Development Corp.* v. *Conservation Commission*, 21 Conn. App. 122, 126–27, 572 A.2d 364 (1990). Our Supreme Court has also ruled that a trial court's order to an inland wetlands commission to approve an application was improper where the commission could accept the application with conditions or modifications. *Feinson* v. *Conservation Commission*, supra, 429.

The decisions in *Milardo* and *Feinson* may easily be distinguished. In those cases, each inland wetlands agency clearly had authority over the applications in question because the applications proposed regulated activities. Here, however, we have determined that the plaintiffs' applications do not propose regulated activities and this conclusion requires that the commission approve the plaintiffs' applications.

The judgment is reversed in part on the cross appeal and the case is remanded with direction to render judgment remanding the matter to the defendant with direction to grant the plaintiffs' applications.

In this opinion the other judges concurred.

