******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# B. SHAWN MCLOUGHLIN ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF BETHEL
## (SC 20541)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiffs appealed to the trial court from the decision of the defendant planning and zoning commission, which had denied their application for a special permit to construct a crematory on property owned by one of the plaintiffs in a business park in the town of Bethel. The property is located in a business park in one of the town's two industrial zones. Prior to submitting their application, the plaintiffs proposed a text amendment to the town's zoning regulations that would make the operation of a crematory a specially permitted use in the town's industrial zones. The commission approved the text amendment, and the plaintiffs submitted their special permit application and an application to construct and operate a crematory on the property. After public hearings, the commission voted to deny both the plaintiffs' special permit application and their application to construct and operate a crematory. The commission reasoned that the plaintiffs had failed to meet their burden of demonstrating that their application satisfied the general standards for special permits set forth in the relevant provision (§ 8.5.E) of the town's zoning regulations. Relying on the Appellate Court's decision in *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission* (176 Conn. App. 570), the trial court dismissed the plaintiffs' appeal, concluding that there was substantial evidence in the record to support the commission's denial of the plaintiffs' special permit application based on the general criteria for special permits set forth in § 8.5.E. The plaintiffs, on the granting of certification, appealed to the Appellate Court, which affirmed the trial court's judgment. On the granting of certification, the plaintiffs appealed to this court. *Held*:

1. The plaintiffs could not prevail on their claim that the Appellate Court misinterpreted and improperly expanded its holding in *St. Joseph's High School, Inc.*: the Appellate Court's holding in *St. Joseph's High School, Inc.*, that a planning and zoning commission may deny an application for a special permit on the basis of generalized considerations but must rely on specific evidence that relates directly to the site under consideration was consistent with this court's precedent requiring that the review of a a special permit application must involve a fact specific inquiry related to the specific site proposed, and the Appellate Court correctly concluded that the trial court reliance on that case was proper; moreover, this court declined the plaintiffs' request to impose a rebuttable presumption that a specially permitted use in a zoning district is compatible with other uses in the district, as the particularized, fact intensive scrutiny the plaintiffs proposed is embedded in the existing standard.

2. The Appellate Court incorrectly concluded that the commission's denial of the plaintiffs' special permit application was supported by substantial evidence, as the reasons enumerated by the commission for denying the application were not supported by site specific facts that pertained to the considerations enumerated in § 8.5.E of the town regulations but, rather, were grounded in facts regarding crematory operations generally, development decisions motivated by general objections, and evidence not pertinent to the required considerations, and, accordingly, this court reversed the Appellate Court's judgment and directed that court to reverse the trial court's judgment and to remand the case with direction to sustain the plaintiffs' appeal and to order the commission to approve the plaintiffs' special permit application:

   a. There was not substantial evidence of adverse environmental effects on which to deny the plaintiffs' application; the evidence and data purportedly demonstrating adverse environmental effects were not specific to the site of the proposed crematory or did not address the mode of operation proposed for the plaintiffs' crematory, and the only environ-

mental evidence specific to the plaintiffs' proposed facility indicated that it would not likely have an adverse environmental effect.

b. There was not substantial evidence that the proposed crematory would have a detrimental effect on neighboring properties and residences or the development of the district: in the absence of specific evidence that the proposed crematory negatively affected neighboring properties, various testimony elicited at the public hearings, including that of the president of a company located on property abutting the plaintiffs' property, that a crematory in the business park would place the park at a competitive disadvantage, decrease property values, and cause property and business owners to sell their properties, rethink expansion plans, or leave town, amounted to mere speculation, and those generalized concerns did not rise to the level of substantial evidence of adverse economic impact sufficient to support the commission's denial of the plaintiffs' special permit application; moreover, testimony from neighboring property owners that they would not have purchased their respective properties if they had known about the proposed crematory, and testimony from the owner of several properties in the business park that he had listed those properties for sale as a result of his emotional and psychological opposition to the crematory, reflected speculative concerns and a generalized "not in my backyard" objection that could not, by itself, serve as substantial evidence for denying the plaintiffs' special permit application.

c. There was not substantial evidence to support the commission's determination that the proposed crematory did not comply with the town regulations because it would require an excessive amount of excavation and fill activity and would have a negative effect on commercial business: although the topography of the site required the plaintiffs to obtain an excavation and fill permit, the commission did not cite to any evidence, such as particular standards or measurements, to support its determination that the excavation and fill activity was excessive, and the fact that the plaintiffs originally preferred to locate the crematory in an existing building instead of constructing a new building was not relevant to the suitability of the location that was ultimately proposed; moreover, the commission did not cite to any evidence on which it relied in determining that businesses may have a decreased ability to attract and to retain customers, and a review of the record revealed no such evidence.

d. There was not substantial evidence to support the commission's conclusion that the proposed crematory did not comply with the general standards in the town regulations because of the plaintiffs' inability to screen the crematory from the view of neighboring properties; the evidence on which the commission relied, namely, testimony from individuals objecting to viewing or being exposed to the crematory and a study on the effect of a crematory on residential housing sales in a town in Wyoming, did not constitute substantial evidence insofar as the study was not specific to the site of the proposed crematory and in light of the absence of evidence as to how the proposed facility would be so stylistically inconsistent with the remainder of the business park as to affect property values.

Argued September 17, 2021—officially released April 5, 2022

*Procedural History*

Appeal from the decision of the defendant denying the plaintiffs' application for a special permit, brought to the Superior Court in the judicial district of Danbury and transferred to the judicial district of Hartford, Land Use Litigation Docket, where Connecticut Coining, Inc., was permitted to intervene as a defendant; thereafter, the case was tried to the court, *Hon. Marshall K. Berger, Jr.*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment dismissing the appeal, from which the plaintiffs, on the granting of certification, appealed to the Appellate Court, *Keller, Prescott* and *Devlin, Js.*, which affirmed the trial court's judgment, and the plaintiffs, on the granting of certification, appealed to this court. *Reversed; judgment directed.*

*Daniel E. Casagrande*, with whom was *Joseph Mortelliti*, for the appellants (plaintiffs).

*Charles R. Andres*, for the appellee (defendant).

*Opinion*

ROBINSON, C. J. The principal issue in this certified appeal is whether the Appellate Court's decision in *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, 176 Conn. App. 570, 170 A.3d 73 (2017) (*St. Joseph's*), allows a zoning commission to deny an application for a special use permit based on the applicant's noncompliance with the general standards enumerated in the zoning regulations, despite its full compliance with the technical requirements contained therein. The plaintiffs, B. Shawn McLoughlin and Mono-Crete Step Co. of CT, LLC (Mono-Crete), appeal, upon our grant of their petition for certification,[1] from the judgment of the Appellate Court, which affirmed the trial court's dismissal of their appeal from the decision of the defendant, the Planning and Zoning Commission of the Town of Bethel (commission), to deny their application for a special permit to construct a crematory on their property.[2] See *McLoughlin* v. *Planning & Zoning Commission*, 200 Conn. App. 307, 309, 334, 240 A.3d 709 (2020). On appeal, the plaintiffs claim that the Appellate Court (1) improperly interpreted its decision in *St. Joseph's* to allow nonspecific objections to the crematory based on the general standards contained in the zoning regulations to serve as a basis for the denial of their application, and (2) incorrectly concluded that the commission's denial of their application was supported by substantial evidence. Although we conclude that the Appellate Court correctly determined that the precedent set by its holding in *St. Joseph's* permits objections based on the general standards in the zoning regulations to serve as the basis for the denial of a special permit application, we nevertheless agree with the plaintiffs' argument that the commission's denial of their application was not supported by substantial evidence. Accordingly, we reverse the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history, aptly set forth by the Appellate Court. "McLoughlin owns property located at 12 Trowbridge Drive (property) in the Clarke Business Park (park) in [the town of] Bethel [town]. The park is located in one of the town's two industrial zones. Mono-Crete, of which McLoughlin is the sole member, operates a business on the property. Mono-Crete produces precast concrete, which is used to make items such as burial vaults.

"Because Mono-Crete's business was declining and the number of cremations in the United States was increasing, McLoughlin decided to seek approval to operate a crematory on the property. In furtherance of that goal, the plaintiffs proposed a text amendment to the Bethel Zoning Regulations (regulations) that would make the operation of a crematory a specially permitted use within either of the two industrial zones in the town. Prior to the commission's voting on the proposed text

amendment, the plaintiffs' counsel acknowledged, at two separate meetings of the commission, that the commission's decision on whether to approve the proposed text amendment and any future special permit application seeking site plan approval were mutually exclusive inquiries, each involving unique considerations.

"On July 22, 2014, the commission voted to approve the text amendment (July, 2014 text amendment) by a four to three vote. The notice of approval, dated August 5, 2014, stipulated that the commission would allow for the specially permitted use of crematories conditioned on the satisfaction of eight technical requirements. The commission also noted that 'the proposed text amendment is . . . a reasonable request . . . in character with the uses in the [i]ndustrial [zone].'

"After the commission approved the July, 2014 text amendment, the plaintiffs submitted a special permit application but withdrew it in January, 2015. The plaintiffs then resubmitted their application on February 25, 2015. On May 7, 2015, the plaintiffs submitted to the commission an application to construct and operate a crematory as required by General Statutes § 19a-320.

"Prior to the plaintiffs' resubmission of their special permit application, Connecticut Coining, Inc. (Connecticut Coining), on February 12, 2015, submitted an application for a text amendment to the commission. The proposed amendment would, in effect, repeal the July, 2014 text amendment and impose a one year moratorium on the commission's entertaining applications for and permitting the construction of crematories in the town. At its May 12, 2015 meeting, the commission voted to adopt this amendment (May, 2015 amendment) by a four to three vote.[3] The plaintiffs then appealed [from] the commission's adoption of the May, 2015 amendment to the Superior Court.

"On June 17, 2015, Connecticut Coining filed an application for a new text amendment that purportedly sought to correct a procedural defect noted by the plaintiffs in their appeal [from] the May, 2015 text amendment (revised repeal amendment). The commission, at its September 22, 2015 meeting, voted to adopt the revised repeal amendment by the same margin that it voted to adopt the May, 2015 amendment.

"Despite its repeal of the July, 2014 text amendment, the commission, nevertheless, continued to deliberate on the plaintiffs' application. After holding four public hearings on the plaintiffs' application, the commission, at its September 8, 2015 deliberative session, voted to deny it by a four to three vote. Three of the four members who voted to approve the July, 2014 text amendment also voted to approve the plaintiffs' application. Meanwhile, the three members who voted against the July, 2014 text amendment also voted against the plaintiffs' application. The chairperson of the commission,

however, voted to approve the July, 2014 text amendment but voted to deny the plaintiffs' application. After voting to deny the plaintiffs' application, the commission, by the same margin, later voted to deny their application to construct and operate a crematory pursuant to § 19a-320.

"At its September 22, 2015 meeting, the commission presented its formal resolution of denial of the plaintiffs' application . . . in which it set forth its reasoning for denying the plaintiffs' application. The commission generally found that '[t]he [plaintiffs] ha[ve] not demonstrated that the proposed use in the proposed location will not cause harmful health effects to neighboring properties or their occupants and ha[ve] not demonstrated that the use will not cause a loss in value of property or economic development potential.' Specifically, the commission stated that the plaintiffs failed to meet their burden of demonstrating that their application satisfied the criteria for special permits set forth in §§ 8.5.E.2, 8.5.E.3, 8.5.E.4, and 8.5.E.5 of the regulations. The plaintiffs filed an appeal from that decision with the Superior Court on October 13, 2015." (Footnote added; footnotes omitted.) *McLoughlin* v. *Planning & Zoning Commission*, supra, 200 Conn. App. 309–14.

Relying on *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 570, the trial court rendered judgment dismissing the plaintiffs' appeal, concluding that there was substantial evidence in the record to support the commission's denial of the application based on the general criteria for special permits set forth in §§ 8.5.E.3, 8.5.E.4 and 8.5.E.5 of the regulations. Subsequently, the Appellate Court granted the plaintiffs' petition for certification to appeal from the judgment of the trial court. See General Statutes § 8-8 (o).

On appeal, the Appellate Court determined that the trial court (1) properly relied on its holding in *St. Joseph's* in concluding that a zoning commission may deny a special permit application on the basis of general standards set forth in the zoning regulations; see *McLoughlin* v. *Planning & Zoning Commission*, supra, 200 Conn. App. 322; and (2) correctly concluded that there was substantial evidence on which the commission based its determination that the plaintiffs had failed to meet their burden of demonstrating that their application satisfied §§ 8.5.E.3 and 8.5.E.4 of the regulations. See id., 327. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 334. This certified appeal followed. See footnote 1 of this opinion.

On appeal to this court, the plaintiffs claim that the Appellate Court (1) improperly expanded *St. Joseph's* and the discretion a zoning commission has to deny a special permit application by crediting general objections and evidence not specific to the proposed site, and (2) incorrectly determined that no substantial evidence

supported the commission's denial of the plaintiffs' special permit application. We address each claim in turn, setting forth additional relevant facts and procedural history as necessary.

Providing context for our review of the plaintiffs' claims in this certified appeal, we note that "the goal of an application for a special [permit] is to seek permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district." (Internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, 270 Conn. 447, 454, 853 A.2d 511 (2004). "The rationale for special permits or special exceptions[4] is that [although] certain uses are generally compatible with uses permitted as of right in particular zoning districts, their precise location and mode of operation must be regulated [by the special permit process] because of topography, traffic problems, neighboring uses, etc. of the site." (Footnote added.) R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 5:1, p. 191. The special permit approval function may be delegated to a zoning commission, planning commission, or a zoning board of appeals, and, "[i]n order for [that] administrative agency to approve a special permit, it must determine that (1) the proposed use of the property is expressly permitted under the zoning regulations, (2) the standards in the regulations are satisfied, (3) any conditions necessary to protect public health, safety, convenience, and property values as provided by General Statutes § 8-2 can be established." Id., p. 192.

I

We begin with the plaintiffs' claim that the Appellate Court both misinterpreted and expanded the holding in *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 570. By way of background, we note that, in resolving the present case, the Appellate Court stated: "[The trial court's] reliance on *St. Joseph's* was not based on the type of testimony that was offered in that case. Rather, in light of what [the Appellate] [C]ourt said in *St. Joseph's* about general standards predicating a commission's denial of a special permit application, the [trial] court concluded that it was compelled to uphold the commission's denial of the plaintiffs' application because the commission 'based [its decision on] *general standards* concerning the nature of the use, the welfare of the town, and the harmony with other uses and the orderly development in the district.' . . . Thus, [the Appellate Court] conclude[d] that the [trial] court properly relied on [its] decision in *St. Joseph's.*" (Emphasis in original.) *McLoughlin* v. *Planning & Zoning Commission*, supra, 200 Conn. App. 322.

The plaintiffs contend that the Appellate Court improperly applied *St. Joseph's* because the facts in the present

case are distinguishable in that the evidence supporting the commission's denial was not grounded on a fact based inquiry into the proposed use of the exact property at issue. They also ask us to impose a rebuttable presumption that, if a particular use is designated as a specially permitted use in a zoning district, then it is compatible with other uses in the district. In response, the commission argues that the plaintiffs' argument is not a critique of the Appellate Court's reliance on its decision in *St. Joseph's* but, instead, is meritless opposition to the general objections made to the commission and considered as substantial evidence in the Appellate Court's analysis. It also contends that creating a new legal standard incorporating a rebuttable presumption is both unnecessary and a modification better suited for legislative consideration. Although the Appellate Court correctly concluded that the trial court properly relied on *St. Joseph's*, we agree with the plaintiffs that it improperly disregarded the significance of the factual, site specific testimony offered in that case. We also conclude, however, that it is not necessary to adopt the rebuttable presumption urged by the plaintiffs.

Whether the Appellate Court properly followed and applied the legal principles it articulated in *St. Joseph's* is a question of law, over which we exercise plenary review. See, e.g., *Gerlt* v. *Planning & Zoning Commission*, 290 Conn. 300, 311, 963 A.2d 24 (2009).

In *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. App. 574, the Appellate Court reviewed a planning and zoning commission's denial of a special permit application to install four light poles to illuminate the athletic field at the plaintiff school. The defendants argued that the trial court incorrectly concluded that the planning and zoning commission was not permitted to deny the application based on noncompliance with general standards contained in the zoning regulations.[5] Id., 572. To determine whether the denial was proper, the Appellate Court canvassed our prior opinions and concluded that, "[u]nder Connecticut law, a zoning commission may deny a special permit application due to noncompliance with general standards contained in the zoning regulations." Id., 599. The Appellate Court stated: "The exercise of [the planning and zoning commission's] discretion 'is inherently [*fact specific*], requiring an examination of the particular circumstances of the *precise site* for which the special permit is sought and the characteristics of the specific neighborhood in which the proposed [use] would [be made].' " (Emphasis added.) Id., 600. Applying that standard, the Appellate Court then determined that the planning and zoning commission's decision to deny the special permit application in *St. Joseph's* was supported by substantial evidence because of the testimony regarding (1) current experiences with the school's noise emissions; see id., 603–607; (2) the temporary nature of the wooded buffers between the light poles and the neigh-

boring properties; see id., 607–608; and (3) personal experiences with loitering following sporting events at the school. See id., 609–15.

The Appellate Court's holding in *St. Joseph's* thus permits a zoning commission to deny an application for a special permit based on generalized considerations but, at the same time, requires specific evidence that relates directly to the site under consideration. Requiring site specific evidence is consistent with previous decisions from this court in the special permit context. For example, in *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 439–446, 941 A.2d 868 (2008), this court upheld a planning and zoning commission's denial of a religious society's application for a special exception to build a temple on its property based on evidence of (1) large attendance at the society's previous events on the property, (2) the effect of the society's past activities on neighboring properties, and (3) the failure of the society to obtain approval of its proposed septic and water supply systems. Similarly, in *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 455–56, this court upheld a zoning board's denial of an application for a special exception to open a residential treatment facility based on the facts that the proposal (1) did not include a security force, (2) did not include any intention to secure its doors with locks, and (3) would have up to 125 residents supervised by only twenty staff members at a time. The court concluded that those facts constituted substantial evidence on which the board could have based its conclusion that the facility posed a safety threat.[6] Id., 456. Thus, the type of evidence deemed legally sufficient by this court in the aforementioned cases consisted of facts specific to the relevant sites and pertinent to the required review.[7]

These precedents establish "that the special permit process is, in fact, discretionary" and "that general considerations such as public health, safety and welfare, which are enumerated in zoning regulations, may be the basis for the denial of a special permit." *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 626–27, 711 A.2d 675 (1998); see *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 32 Conn. App. 515, 522, 630 A.2d 108 (1993) (rejecting plaintiff's argument that "the general health, safety and welfare requirements contained in the [zoning] regulations must be considered only for the purpose of placing conditions on a special permit and may not be considered in determining whether to deny or grant the permit"), aff'd, 229 Conn. 176, 640 A.2d 100 (1994). These cases also establish, however, that review of a special permit application must still be a fact specific inquiry related to the precise site proposed. See *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 457. Put differently, although the considerations relevant to

review of a special permit application can be general, the evidence bearing on those considerations cannot be.

We do, however, agree with the commission that we need not modify the standard set forth in *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. 599–600, as the plaintiffs suggest in asking us to impose a rebuttable presumption that specially permitted uses are compatible with other uses in the district. That modification is not necessary because the plaintiffs' proposed standard of determining "whether the evidence in support of denial is based on a fact intensive scrutiny . . . into whether the *'particular'* application . . . would be compatible with the *'particular'* surrounding neighborhood" is embedded in the existing standard. (Emphasis in original.) Unless judicial review[8] reveals substantial evidence to support such a particularized finding, then nonparticularized, general objections will be an insufficient basis for upholding a zoning commission's denial of a special permit application. See *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587, 628 A.2d 1286 (1993) (plaintiff meets burden in appeal by establishing "that substantial evidence does not exist in the record as a whole to support the agency's decision").

Having concluded that the Appellate Court's holding in *St. Joseph's* allows a zoning commission to deny a special use permit based on facts specific to the proposed site that indicate incompatibility with general standards, we now turn to the commission's decision to deny the plaintiffs' application in the present case.

## II

The plaintiffs next claim that the commission's decision was not supported by substantial evidence because general objections, objections based on mere visibility, and evidence not particular to the proposed site are improper bases for denying a special permit application. In response, the commission argues that there was substantial evidence in the record on which it based its denial of the plaintiffs' application because (1) the evidence in the record was, in fact, specific to the proposed use and location, and (2) "real human concerns" should not be discredited as mere speculation. Addressing each of these reasons in turn, we agree with the plaintiffs and conclude that the commission's decision was not supported by substantial evidence.

The applicable standard of review is well established. "In reviewing a decision of a zoning [commission], a reviewing court is bound by the substantial evidence rule, according to which . . . [c]onclusions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the

trial court would have reached the same conclusion, but whether the record before the [commission] supports the decision reached." (Internal quotation marks omitted.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 453. "If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Internal quotation marks omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 427; see, e.g., *Caruso* v. *Zoning Board of Appeals*, 320 Conn. 315, 321, 130 A.3d 241 (2016).

"The substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." (Internal quotation marks omitted.) *Clifford* v. *Planning & Zoning Commission*, 280 Conn. 434, 452, 908 A.2d 1049 (2006). When a zoning commission has stated a reason for denying a special permit application, as the commission in the present case has done, "the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations [that] the commission is required to apply under the zoning regulations." (Internal quotation marks omitted.) *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 629. In other words, we must uphold the decision of the commission if the record reveals that any one of its reasons for denying the special permit application is supported by facts that are specific to the proposed site and that pertain to the considerations enumerated in the regulations. Having set forth the proper standard, we address each of the commission's reasons as they relate to each of the relevant regulations.

A

With respect to the commission's conclusion that the plaintiffs' proposed crematory did not comply with § 8.5.E.2[9] of the regulations because of the potential adverse effects caused by emissions released into the environment, the trial court determined that the cited evidence reflected nothing more substantial than " 'mere worries and concerns.' " We agree and hold that there was not substantial evidence of adverse environmental effects on which to deny the plaintiffs' application.

In determining that the plaintiffs failed to meet the

criteria set forth in § 8.5.E.2 of the regulations, the commission stated that it "heard expert testimony and was provided studies, data and analyses [that] contradicted the [plaintiffs'] testimony. The analyses uncovered flaws in the methods used and revealed discrepancies in the data and outcomes presented by the [plaintiffs] and concluded that emissions released into the atmosphere from the crematory facility can and will in fact carry several hazardous toxins at levels above allowable standards . . . ." During the commission's May 12, 2015 public hearing on the special permit application, Mitchell Gross, an engineering expert and neighboring property owner, testified that "burning bodies and burning bodies that are embalmed produces great amounts of dioxin and furans. . . . [And] the subtle thing about dioxins is you don't smell them. They just give you cancer." Mitchell Gross referenced various studies and data in support of his testimony, although none of this information was site specific. For example, he discussed a 2010 journal article that described the effect of crematory operations on residential house sales in Rawlins, Wyoming, showed cadmium emissions exceeding the allowable limit under applicable environmental standards by 205 percent, and showed dioxin and furan emissions exceeding the allowable limit by 2200 percent. See M. Agee & T. Crocker, "Directional Heterogeneity of Environmental Disamenities: The Impact of Crematory Operations on Adjacent Residential Values," 42 Applied Economics 1735, 1738–39 (2010) (Rawlins study). The Rawlins study, like the other studies mentioned in Mitchell Gross' testimony, was not specific to the facility or site proposed and did not address the mode of operation proposed for this particular crematory facility. See *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 457 ("[r]eview of a special permit application is inherently [fact specific], requiring an examination of the particular circumstances of the precise site for which the special permit is sought and the characteristics of the specific neighborhood in which the proposed [use] would be [made]"). Because the commission's determination that the plaintiffs' application did not comply with § 8.5.E.2 of the regulations is not supported by evidence pertaining to the particular circumstances of the precise site proposed, we conclude that this determination was not supported by substantial evidence.

*Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, supra, 285 Conn. 381, provides an example of evidence that would have sufficed in supporting the commission's denial. Following testimony from an engineer that the proposed septic system would have no impact on neighboring properties, another engineer and an ecological consultant testified that the proposed septic system did not appear to comply with state requirements and would not function properly as designed. Id., 444. We cited to this evidence

in concluding that there was substantial evidence to support the determination of the planning and zoning commission in that case that the proposed use did not comply with the relevant general consideration. Id., 446.

Indeed, the only site specific environmental evidence in the present case indicated that there were *no* likely adverse environmental effects. The Director of Health of the town's health department submitted a letter, read into the record at the April 14, 2015 public hearing, stating that Department of Public Health toxicologists advised that, "if a small source such as this proposal follows the requirements of its [Department of Energy and Environmental Protection] permit, there should *not* be significant air quality issues." (Emphasis added.) The letter also stated that, after reviewing the plaintiffs' application and proposed plans, the town's health department had no objection to the application, so long as the commission attached conditions to its approval to ensure that the state environmental and public health permit requirements and approvals were met and maintained. Unlike in *Cambodian Buddhist Society of Connecticut, Inc.*, there was no expert testimony in the present case that reviewed the plaintiffs' proposal and explained why the proposal did, in fact, present air quality issues out of compliance with the state environmental and public health permitting requirements.[10]

### B

We next address the commission's conclusion that the proposed crematory did not comply with § 8.5.E.3[11] of the regulations because it would have a detrimental effect on the neighboring properties and residences, as well as the development of the district. We hold that there was not substantial evidence in the record supporting this reason for the commission's denial of the plaintiffs' special permit application. The commission cites to a great deal of evidence in support of its determination that the plaintiffs' application did not satisfy this regulation, and we will assess each item in turn to determine if it is, in fact, the substantial evidence necessary to support its decision during judicial review. Additional facts and procedural history are set forth as necessary.

### 1

The commission first cites to testimony from the town's Economic Development Commission (development commission), positing that plans to expand the park may be halted as a result of the crematory. The development commission also claimed that there was a concern about the potential reduced value of the park properties, as well as the loss of marketability and viability of land for development. The commission further cites to testimony from the development commission indicating that the crematory would put the park at a competitive disadvantage in recruiting businesses.

In its March 24, 2014 letter to the commission, the development commission stated that "[a] cremator[y] may negatively impact [the development commission's] ability to attract commercial businesses. . . . A cremator[y] in the park may discourage commercial business investment in the expansion area. . . . A cremator[y] in the park may discourage businesses from moving to or expanding within the park. . . . Studies have shown a crematory has a negative impact on surrounding home values. . . . A cremator[y] may have a negative impact on future development/ownership within the park." In reference to this letter, a member of the commission stated at the April 22, 2014 public hearing on the plaintiffs' text amendment that "there is no more general a statement than that" and that the commission needed "proof and facts of how [the crematory is] going to decrease economic activity . . . ." The development commission did not cite any specific facts as a basis for these conclusions. In the absence of actual facts, the development commission's letter amounted to mere speculation that cannot provide support for the commission's decision. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 71, 848 A.2d 395 (2004) ("[e]vidence of general environmental impacts, mere speculation, or general concerns do not qualify as substantial evidence"). As the plaintiffs argue, a challenge to "allowing a crematory anywhere in the . . . park may have been appropriate in the commission's legislative consideration of the text amendment but had no proper place in the site specific inquiry required for the special permit application."

The development commission attempted to remedy the speculative nature of its submission. On May 27, 2014, the commission held another public hearing, at which Johnny Choi, the owner of several properties in the park, testified that, if the crematory facility were approved, he would put the fifteen properties he owns in the town up for sale. On April 13, 2015, the town development commission sent another letter to the commission, stating that its "concerns recently became a reality when a property owner in [the] [p]ark, [Johnny] Choi . . . put all of his seven . . . properties (both commercial and residential) on the market." Based on our review of the record, the development commission's concerns remain generalized because, even in light of the sale, there was no evidence that the proposed crematory negatively affected those properties, by, for example, diminishing their value. Thus, there was nothing that actually rose to the level of substantial evidence of adverse economic impact sufficient to support the commission's denial of the special permit application. See, e.g., *Lord Family of Windsor, LLC* v. *Inland Wetlands & Watercourses Commission*, 103 Conn. App. 354, 363, 928 A.2d 1237 (2007) ("[e]vidence of general environmental impacts, mere speculation, or general

concerns" still do not qualify as substantial evidence even when testified to by expert (internal quotation marks omitted)), aff'd, 288 Conn. 669, 954 A.2d 133 (2008); see also *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 71 (same).

Finally, in its July 13, 2015 letter to the commission, the development commission stated that it was "concerned that the proposed location of the site would be so close to the road that it would negatively impact [its] ability to sell the additional lots for a fair price." Again, the development commission did not cite to any site specific studies, such as real estate appraisals, as a basis for its concern that lots would not sell at a fair price. Thus, none of the testimony from the development commission amounts to substantial evidence of the effect that the crematory would have on neighboring property and development.

2

Next, the commission cites to testimony from Gregory Marciano—the president and owner of the intervening defendant, Connecticut Coining,[12] which is located on abutting property at 10 Trowbridge Drive—stating that (1) the proposed crematory would be visible from his property, (2) the proposed crematory would negatively affect his ability to retain employees, (3) he may rethink expanding his business, and (4) the approval of the crematory could influence his decision to leave the town.

At the commission's April 14, 2015 public hearing, Marciano testified that, regardless of whether his employees' concerns are real or perceived, he could lose them because of their perception of crematory operations, and that he might have to leave the town if that loss came to pass. At the July 15, 2015 public hearing, Attorney Neil Marcus, testifying on behalf of Marciano, reiterated that, if Connecticut Coining's employeeshave a problem being next to a crematory, then Marciano will not look to expand his business in the town and may have to relocate when it comes time to expand.

Marciano's testimony was grounded in speculative concerns regarding his ability to retain employees, which does not, by itself, amount to substantial evidence. Had Marciano's concerns, or those of his employees, been based on a factual inquiry of the effects of the facility at the proposed site, rather than general objections to the crematory, his testimony might have sufficed as fact based and site specific evidence. As we have discussed, general concerns, speculation, and mere worry, without more, do not qualify as substantial evidence. See *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 71; see also *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, 189 Conn. App.

332, 349, 207 A.3d 1053 (2019) ("public testimony is not to be considered substantial evidence when it is not supported by anything other than speculation and conjecture on the part of those objecting to the [party's] proposed activities" (internal quotation marks omitted)); *Lord Family of Windsor, LLC* v. *Inland Wetlands & Watercourses Commission*, supra, 103 Conn. App. 365 ("[a] mere worry is not substantial evidence"). And, if the commission cannot base its conclusion on general concerns, speculation, and mere worry, then it cannot base its conclusion on community members' business development decisions, potential or actual, that are themselves reflections of concerns that are not site specific, speculation, and mere worry. If we were to hold otherwise, individual members of a community would be able to block any special use permit application by pausing current developments or even by mere reference to hypothetical future intentions to do so due to unsubstantiated fears about future events, an approach that is wholly inconsistent with the obligation of local land use authorities to exercise their authority for the benefit of the community as a whole.[13] Further, citing such hypothetical intentions as substantial evidence would render the statutory right of appeal from the decision of local zoning authorities ineffectual, as the courts cannot disturb the decision of a zoning commission when evidence relevant to appropriate considerations is present. See R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 34:3, p. 335. Put differently, Marciano's general concerns do not become substantial evidence at the mere mention of a possible development decision.

Because the only reason testified to by both Marciano and Marcus for the decision to rethink an expansion and relocate was grounded in Marciano's speculative concerns as to his employees' potentially abandoning their employment—specifically on the basis of their subjective perceptions of crematory operations—their testimony cannot be considered substantial evidence as to whether the proposed facility will have a detrimental effect on the development of the district, as it is nothing more than a general objection.

3

Next, the commission cites to testimony from Wendy Gross and Mitchell Gross, the coowners of 13 Trowbridge Drive, that (1) they would not have purchased their property had they known about the proposed crematory, (2) the proposed facility was not disclosed to them during their property negotiations, (3) they will not invest in their property as intended, and (4) they already placed one property up for sale.

At the April 14, 2015 hearing, Wendy Gross stated that, if she and Mitchell Gross had known about the proposed crematory, then they would not have purchased the property at 13 Trowbridge Drive, and that

real estate agents' failure to tell anyone about the proposal evidences "how scared they are of the effect it's going to have on property values." Mitchell Gross stated in a letter to the commission that he had delayed approximately $100,000 worth of planned construction on the property. Finally, at the June 16, 2015 public hearing, Mitchell Gross testified that he listed his property for sale at $1.25 million, which was less than he paid for it, even without accounting for the improvements he had made to the building.

Wendy Gross' testimony as to the potential effect on property values is plainly speculative. Further, Wendy Gross cited to religious issues, personal repercussions, such as no longer being able to walk dogs in the park, and speculative concerns as to employees feeling "very upset and conflicted by [the proposed facility]" as the basis for opposition to the proposed facility. Because her declaration that she would not have purchased the property had she known of the proposed crematory was grounded in these speculative concerns, this testimony is also nothing more than a general objection accompanied by another hypothetical property decision. See footnote 13 of this opinion.

Moreover, if Mitchell Gross had sold his property at a loss as a direct result of the proposed crematory, the commission could have properly considered that as evidence of the detrimental effect of the proposed crematory. However, the record does not support that claim. Mitchell Gross' testimony was that "it cost [him] more than $1.25 million to buy [the property], and [he had] added improvements to the building . . . ." According to testimony from the plaintiffs' counsel, the warranty deed submitted into the record reflected that Mitchell Gross purchased the property less than three months prior for $1.075 million, and there is no evidence as to the value of the improvements he made. Even if the commission had credited testimony that Mitchell Gross sold his property at a loss,[14] there was no evidence that any property values were negatively affected specifically as a result of the proposed crematory.

With respect to Mitchell Gross' decision to stop investing in the property and to put it on the market, in the absence of specific evidence about the detrimental effects of the proposed facility, a generalized "not in my backyard" (NIMBY)[15] reaction cannot, by itself, serve as substantial evidence for denying the plaintiffs' application, even if that reaction motivated his investment and sale decisions.[16] See, e.g., *T-Mobile Central, LLC* v. *West Bloomfield*, 691 F.3d 794, 801 (6th Cir. 2012) ("If . . . these generalized objections sufficed, any wireless facility could be rejected. Anyone who opposed a cell tower in their backyard could offer an excuse that it would be bad for the community, would not be aesthetically pleasing, or would be otherwise objectionable. But that by itself is not enough. There must be evidence.

And not just any evidence—evidence that is *substantial*." (Emphasis in original.)); *Verizon Wireless (VAW), LLC* v. *Board of County Commissioners*, 544 F. Supp. 2d 1218, 1249 (D. Kan. 2008) ("[s]uch generalized 'not in my backyard' opposition does not, as a matter of law, constitute substantial evidence on which to deny a proposed wireless telecommunications facility on aesthetics grounds"); *Sprint Spectrum*, *L.P.* v. *St. Charles*, Docket No. 4:04CV1144 RWS, 2005 WL 1661496, *6 (E.D. Mo. July 6, 2005) ("None of the residents offered any evidence *in support of their opposition*. A 'not in my backyard' generalized objection does not constitute substantial evidence to support the denial of a . . . permit." (Emphasis added.)). When Mitchell Gross announced at the June 16, 2015 hearing that his business put its property on the market, he plainly stated that they "certainly don't want [the crematory] in [their] backyard," which was one of many reactions evoking NIMBY concerns during the public hearings on the plaintiffs' text amendment and special permit application. Mitchell Gross did not present any facts specific to the proposed site evidencing the detriment of the proposed facility, only what would result from his opposition to the crematory, supported by generalized NIMBY concerns. Members of the commission appeared to recognize this evidentiary gap during the April 14, 2015 hearing, when one commission member indicated the need for evidence showing a detrimental effect on neighboring properties, such as an appraisal showing that a property next to the proposed facility would be worth less.[17] Accordingly, the testimony from Wendy and Mitchell Gross does not constitute substantial evidence of the proposed crematory's detrimental effect on surrounding properties or development.

4

Next, the commission cites to testimony from the owner of seven properties in the park, stating that he placed all seven up for sale and ceased expansion negotiations. The testimony in the record most similar to what the commission cites is that of Henry and Johnny Choi at the May 27, 2014 hearing, in which Henry Choi stated that they are "seriously considering" moving out of the town. Later, Johnny Choi discussed a number of business ventures he planned to bring to the town before stating that, if the plaintiffs' text amendment is approved, he would put his properties up for sale because he does not want his "business near any emotion or psychological feelings . . . ."

The testimony of Henry and Johnny Choi does not constitute substantial evidence, insofar as it is simply another NIMBY reaction that motivated their sale and development decisions. Again, there is no factual and site specific evidence that the proposed crematory had a detrimental effect on surrounding properties and development, only that Henry and Johnny Choi's oppo-

sition to the proposal motivated their development decision. As we discussed, opposition, and the results of such opposition, supported *only* by NIMBY sentiments is not substantial evidence justifying the denial of a special permit. Because Henry and Johnny Choi based their investment decisions on their fear of perceived emotions, rather than any factual concerns relating to the proposed facility, the listing and potential sale of their properties do not constitute substantial evidence.

5

Finally, the commission cites to testimony from John Holbrook, the owner of an organic farm at 45 Turkey Plain Road, who claimed that his organic designation may be jeopardized by toxic particle emissions from the proposed crematory. At the April 14, 2015 hearing, Holbrook stated that the "threat of mercury poisoning [would] kill [his] business in a New York minute." At the June 16, 2015 hearing, Holbrook also explained that his farm is currently not certified as organic because he does not "want the government coming [on] to [his] property." If he were ever forced to become certified, he testified that he would not be able to because of the "dioxin, mercury and a number of other pollutants [on his] land." The record reveals no evidence to support Holbrook's concerns about the negative environmental effect of the crematory on his organic farming operation. Indeed, had there been evidence that the proximity of Holbrook's farm to the proposed crematory would actually inhibit the operation of the organic farm, then this certainly would have been the type of testimony that evidences a detrimental effect on development and neighboring properties. But, on this record, not only is it speculative that Holbrook's land will be polluted by the proposed crematory, it is speculative that he will one day be mandated to have his farm certified as organic, and it is entirely speculative that he would be unable to do so because of the crematory operations. To the extent that Holbrook's testimony that the Northeast Organic Farming Association of Connecticut will close his farm if dioxins are present does confirm that Holbrook's farm might one day be regulated, it still does not confirm whether the proposed crematory will itself result in dioxin emissions that negatively affect Holbrook's farm. Thus, we conclude that Holbrook's testimony does not amount to substantial evidence and, further, that the record as a whole reveals no substantial evidence for the commission's finding that the proposed facility will have a detrimental effect on neighboring properties and the development of the district.[18]

C

We next address the commission's determination that the proposed crematory did not comply with § 8.5.E.4[19] of the regulations because of the excavation and fill activity the proposal requires and the potential effect on the increasingly commercial businesses surrounding

the proposed location. We conclude that there is not substantial evidence to support this conclusion.

At the commission's April 22, 2014 meeting, the plaintiffs' counsel stated that their preference was to locate the crematory in their existing building but that the 500 foot requirement set forth in General Statutes § 8-2n[20] precluded them from doing so. The proposed site, the location of which complied with § 8-2n, contained moderate to severe topography, rendering an excavation and fill permit necessary to proceed with the development. Accordingly, the commission determined that the application did not comply with § 8.5.E.4 of the regulations because (1) it required an excessive amount of excavation and fill activity, as well as a series of retaining walls for level access, (2) the plaintiffs' counsel had testified that the proposed site was not their ideal location, and (3) the proposed use may affect the ability of surrounding businesses to attract and retain customers.

Although the record supports the necessity of excavation and fill activity, along with the construction of retaining walls, the commission does not cite to any evidence on which it relied to determine that the activity was *excessive* in nature. Although the commission states that "[t]he grade must be lowered upwards of [eighteen] feet in some locations," our review of the record does not reveal why, or by what standards, that particular measurement renders the excavation and fill activity excessive, or otherwise indicates a lack of suitability.

As to counsel's testimony at the hearing, we fail to see how the plaintiffs' original preference to place the crematory in their existing building rather than constructing a new building is at all relevant to whether the location ultimately proposed is itself suitable for the crematory. See *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 629. The existing location may be more desirable to the applicant, presumably due to cost considerations, but it does not follow that the proposed location is unsuitable.

Finally, the commission did not cite to any evidence in the record on which it relied in determining that businesses surrounding the proposed crematory may have a decreased ability to attract and retain customers. Our review of the record also reveals no such evidence. Accordingly, we conclude that there is not sufficient evidence in the record to support the commission's determination that the plaintiffs' application did not comply with § 8.5.E.4 of the regulations.[21]

D

Finally, we address the commission's conclusion that the proposed crematory did not comply with § 8.5.E.5 (a) and (b)[22] of the regulations because of the plaintiffs' inability to screen the crematory from the view of neighboring properties, which the commission stated would

likely result in a decline in their value. We conclude that there is not substantial evidence to support this determination.

In support of its determination, the commission cited to (1) testimony "from those who have expressed objection[s] to viewing or being exposed to the operation of a crematory facility," and (2) the Rawlins study. See part II A of this opinion. In regard to the testimony, we previously explained that general concerns do not qualify as substantial evidence. See, e.g., *American Institute for Neuro-Integrative Development, Inc.* v. *Town Plan & Zoning Commission*, supra, 189 Conn. App. 341; *Lord Family of Windsor, LLC* v. *Inland Wetlands & Watercourses Commission*, supra, 103 Conn. App. 365. Thus, general objections to viewing or being exposed to the proposed facility are not substantial evidence. Without evidence as to how the proposed facility is so stylistically inconsistent with the rest of the park that it would have a detrimental effect on property values therein, the fact that the proposed building and smoke stacks would be visible from the street does not support a finding that the proposed crematory is not suitable in relation to the rest of the park or that the visibility of that facility affects the value of the neighboring properties. Cf. *Mendonsa* v. *Corey*, 495 A.2d 257, 259, 261 (R.I. 1985) (holding that there was substantial evidence for zoning board of review to deny special exception permit on basis of, inter alia, testimony from qualified real estate expert that construction of fifty-one townhouse units on less than ten acres would increase density within neighborhood and diminish value of neighboring single family homes). Because there is no other evidence in the record to support the commission's determination that the plaintiffs' application did not comply with § 8.5.E.5 (a) and (b) of the regulations, insofar as the Rawlins study does not examine the specific site proposed, we conclude that there was no substantial evidence on which that conclusion could have been based.[23]

In sum, the commission's decision to deny the plaintiffs' application for a special permit to construct a crematory on its property was based only on general facts regarding crematory operations not specific to the proposed site, development decisions motivated by general objections to the proposed facility, and evidence not pertinent to the required considerations. The record, therefore, does not reveal substantial evidence on which the commission based its decision. Accordingly, we conclude that the Appellate Court improperly affirmed the judgment of the trial court. Instead, it should have rendered judgment directing the trial court to order the commission to approve the plaintiffs' application under terms and conditions reasonable and necessary to protect the public, as permitted by § 8.5.F.4 (a)[24] of the regulations. See *Mobil Oil Corp.* v. *Zoning Commission*, 30 Conn. App. 816, 821, 622 A.2d 1035

(1993) (concluding that, if there is no basis for zoning commission's denial of special permit application, trial court shall order commission to approve application).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court with direction to sustain the plaintiffs' appeal and to order the commission to approve the plaintiffs' application for a special permit.

In this opinion the other justices concurred.

[1] We granted the plaintiffs' petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that, under *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, [supra, 176 Conn. App. 570], a zoning commission can deny a special use permit application based on noncompliance with the general standards enumerated in the zoning regulations despite full compliance with the technical requirements?" And (2) "If the answer to the first question is in the affirmative, did the Appellate Court correctly determine that substantial evidence supported the decision of the defendant planning and zoning commission to deny the plaintiffs' special use permit application?" *McLoughlin* v. *Planning & Zoning Commission*, 335 Conn. 978, 241 A.3d 131 (2020).

[2] "On March 9, 2016, Connecticut Coining, Inc., a business located near the proposed crematory, moved to intervene as a defendant in the plaintiffs' appeal pursuant to Practice Book § 9-6 and General Statutes § 8-8 (p). The trial court granted this motion on September 17, 2018." *McLoughlin* v. *Planning & Zoning Commission*, 200 Conn. App. 307, 309 n.1, 240 A.3d 709 (2020). We note that Connecticut Coining, Inc., filed a brief with and participated at oral argument before the Appellate Court. See id. It has not, however, filed a brief in this certified appeal. Accordingly, any references herein to the defendant are to the commission.

[3] The moratorium on crematory applications established by the May, 2015 amendment did not preclude the plaintiffs' application from being considered. See General Statutes § 8-2h (a) ("[a]n application filed with a . . . planning and zoning commission . . . of a town . . . which is in conformance with the applicable zoning regulations as of the time of filing shall not be required to comply with, nor shall it be disapproved for the reason that it does not comply with, any change in the zoning regulations or the boundaries of zoning districts of such town . . . taking effect after the filing of such application"). We note that the moratorium did not take effect until May 12, 2015, which was subsequent to the plaintiffs' resubmission of a special permit application on February 25, 2015, and their submission of an application to construct and operate a crematory on May 7, 2015.

[4] "The terms 'special permit' and 'special exception' have the same meaning and can be used interchangeably." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 5:1, p. 191.

[5] The general standard at issue in *St. Joseph's* provided: " 'The location and size of such [special permit] use, and the nature and intensity of operations involved in or conducted in connection therewith, shall be such that both pedestrian and vehicular traffic to and from and in the vicinity of the use will not be hazardous or inconvenient to, or detrimental to the character of the said residential district or conflict with the traffic characteristics of the neighborhood. . . . Access, parking, service areas, lighting, signs and landscaping shall be designed so as to protect the residential character of surrounding residential neighborhoods or residential zones.' " *St. Joseph's High School, Inc.* v. *Planning & Zoning Commission*, supra, 176 Conn. 581 n.12. In contrast to the general standard, the technical requirements included, inter alia, a maximum height for light poles, a minimum distance from abutting residential property lines, and a photometric plan submission. Id., 573.

[6] Although this court's decision in *Municipal Funding, LLC* does mention the testimony of several neighbors who were fearful based on their personal perceptions of the proposed facility, the court clarified that "there [nevertheless] was a sufficient *factual* basis in the record to support a determination that a genuine threat to public safety had been demonstrated." (Emphasis added.) *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 456 n.7.

[7] Relying on *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619,

626–27, 711 A.2d 675 (1998), among other cases, the commission argues that requiring this type of site specific evidence precludes zoning commissions from denying applications for entirely new special permit uses. The commission's reliance on *Irwin* is misplaced because the evidence credited in that case was, inter alia, expert testimony as to the effect the proposed use would have on the specific site proposed. See id., 632. *Irwin* provides an example of the fact specific, site specific testimony necessary to uphold the denial of a special permit application for a new use before the facility is constructed.

Consistent with *Irwin*, we note that another example of proper evidence for a new special permit use is the appraisal of properties neighboring the specific site to demonstrate whether the proposed use would affect their value, as the commission requested in the present case. See footnote 17 of this opinion.

[8] This standard is specific to judicial review, as the applicants' burden before the commission was to persuade the commission that the application was compatible with the zoning regulations; see, e.g., *Upjohn Co.* v. *Planning & Zoning Commission*, 224 Conn. 82, 89, 616 A.2d 786 (1992); and, as discussed subsequently in this opinion, the plaintiffs' burden on appeal is to establish that there is no substantial evidence in the record to support the commission's decision. See, e.g., *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 453; *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 587, 628 A.2d 1286 (1993).

[9] Section 8.5.E.2 of the regulations requires the commission to evaluate "[w]hether appropriate consideration has been given to the protection, preservation, and/or enhancement of natural, scenic, historic, and unique resources including, where appropriate, the use of conservation restrictions to protect and permanently preserve natural, scenic, historic, or unique features which enhance the character and environment of the area."

[10] There was testimony in the record that the plaintiffs' ambient impact analysis was incorrect but no testimony that a proper analysis was conducted that evidenced environmental noncompliance.

[11] Section 8.5.E.3 of the regulations requires the commission to consider "[w]hether the proposed use will have a detrimental effect on neighboring properties and residences or the development of the district."

[12] See footnote 2 of this opinion.

[13] If a zoning commission credited this testimony, this court could not disturb that credibility determination, even if it seemed clear to us that the vow not to undergo expansion was an empty statement merely to derail an application. See *Municipal Funding, LLC* v. *Zoning Board of Appeals*, supra, 270 Conn. 453. Instead, because the commission cited this testimony as a reason for its denial, we assume that the commission found this testimony credible but nevertheless conclude that it does not constitute substantial evidence as a matter of law. To conclude otherwise would be inconsistent with the responsibility of local land use authorities, "[i]n exercising their zoning powers . . . [to] act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community." (Internal quotation marks omitted.) *North Haven Opportunity for Affordable Housing, Inc.* v. *Planning & Zoning Commission*, Docket No. CV-15-6058868-S, 2016 WL 1578379, *4 n.7 (Conn. Super. February 25, 2016). As one leading authority has stated: "Discretionary development review too often involves the ad hocery that . . . has [been] described as trial by neighborism. . . . A zoning ordinance cannot permit administrative officers or boards to pick and choose the recipients of their favors. One would hope that courts would apply procedural due process protections to local legislative zoning decisions on individual development applications . . . . [T]oday the question largely remains of how to confine and structure necessary discretionary power while providing for effective safeguards against the abuse of discretion in the development review process." (Footnotes omitted; internal quotation marks omitted.) 1 E. Ziegler, Rathkopf's The Law of Zoning and Planning (2011) § 11:4, pp. 11-10 through 11-11.

[14] After citing to all of the public testimony on which it relied to determine that the plaintiffs' application did not comply with § 8.5.E.3 of the regulations, the commission stated that it found the public testimony to be credible and compelling evidence. Notably, Mitchell Gross' testimony that he listed his property for less than he paid for it was not among the testimony cited by the commission.

[15] " 'NIMBY conflicts arise from projects that typically generate widely dispersed benefits while imposing concentrated costs, such as homeless shelters, prisons, airports, sports stadiums, and waste disposal sites. Despite

the social desirability of such projects, they often provoke intense local resistance that harnesses the political process to block construction of the proposed facility.' " *Kennedy* v. *Zoning Hearing Board*, 575 Pa. 105, 126 n.27, 834 A.2d 1104 (2003), quoting B. Richman, "Mandating Negotiations to Solve the *NIMBY* Problem: A Creative Regulatory Response," 20 UCLA J. Environmental L. & Policy 223, 223 (2002). " '[T]hey often deploy alternative regulatory rationales, such as environmental impact statements, historic districts, aboriginal burial sites, agricultural preservation, wetlands, flood plains, access for the disabled and protection of (often unidentified) endangered species at other local, state and federal government forums, including courts of law.' " *Kennedy* v. *Zoning Hearing Board*, supra, 125 n. 27, quoting W. Fischel, "Voting, Risk Aversion, and the NIMBY Syndrome: A Comment on Robert Nelson's 'Privatizing the Neighborhood,' " 7 Geo. Mason L. Rev. 881, 882 (1999).

[16] See footnotes 13 and 15 of this opinion.

[17] The commission member stated: "[N]ot once did somebody put on this desk, [as] part of the public record, some [evidence that a] real estate appraiser said that my property is going to be worth less than it is next door to a crematory. . . . [T]hey need to come up with a piece of paper that says absolutely, here it is . . . it's less."

[18] In explaining why the plaintiffs did not satisfy § 8.5.E.3 of the regulations, the commission also referenced the reason cited for why the plaintiffs did not satisfy § 8.5.E.2 of the regulations. See part II A of this opinion. Because we conclude in part II A of this opinion that that reason does not constitute substantial evidence, we need not repeat that analysis here.

[19] Section 8.5.E.4 of the regulations requires the commission to determine "[w]hether the location and size of the site, the nature and intensity of the operations involved in or conducted in connection with the use, and the location of the site with respect to streets giving access to it are such that the use will be in harmony with the appropriate and orderly development in the district in which it is located and shall promote the welfare of the [t]own."

[20] General Statutes § 8-2n provides in relevant part: "The zoning regulations adopted under section 8-2 or any special act shall not authorize the location of a crematory within five hundred feet of any residential structure or land zoned for residential purposes not owned by the owner of the crematory. . . ."

[21] In explaining why the plaintiffs did not satisfy § 8.5.E.4 of the regulations, the commission also referenced the reasons cited for why the plaintiffs did not satisfy §§ 8.5.E.2 and 8.5.E.3. See parts II A and B of this opinion. In light of our conclusion that those reasons are not supported by substantial evidence, we need not repeat that analysis here.

[22] Section 8.5.E.5 (a) of the regulations requires the commission to consider "[w]hether the design elements of the proposed development will be attractive and suitable in relation to site characteristics, the style of other buildings in the immediate area, and the existing and probable future character of the neighborhood in which the use is located." Section 8.5.E.5 (b) of the regulations requires the commission to consider "[w]hether the location, nature and height of buildings, walls, and fences, planned activities and the nature and extent of landscaping on the site will be such that the use shall not hinder or discourage the appropriate development and use of adjacent land and buildings or impair the value thereof."

[23] In explaining why the plaintiffs did not satisfy § 8.5.E.5 (a) and (b) of the regulations, the commission also referenced the reasons cited for why the plaintiffs did not satisfy § 8.5.E.3. See part II B of this opinion. Because we conclude in this section that those reasons are not supported by substantial evidence, we need not repeat that analysis here.

[24] Section 8.5.F.4 of the regulations provides in relevant part: "In granting a Special Permit, the Commission may: (a) stipulate such conditions as are reasonable and necessary to protect or promote the public health, safety or welfare; property values; the environment; sound planning and zoning principles; improved land use, site planning and land development; or better overall neighborhood compatibility . . . ."